# 𝖂𝖍𝖊𝖊𝖑𝖎𝖓𝖌.

## FRANCIS H. LUDINGTON *vs.* JOHN S. GABBERT *et al.*

### July Term, 1872.

1. Where a party residing in Greenbrier county, in 1863, is compelled, by threats of arrest for disloyalty to the Confederate government, to receive Confederate treasury notes in payment of a debt created before the beginning of the rebellion, he is entitled to relief against such payment by a sale of the land involved in the transaction, to enforce his vendor's lien.

2. But inasmuch as the party so compelled to receive the treasury notes, voluntarily converted them into Confederate bonds, he must account for the cash value thereof at the date of conversion.

The points at issue in this case appear in the opinion of Berkshire, P.

The cause was brought to February rules, 1868, in the circuit court of Greenbrier county. Decree dismissing bill January term, 1869.

The complainant appealed to this court.

*Snyder* for appellant.
*Harris* for appellees.

BERKSHIRE, P. The appellant filed his bill in the circuit court of Greenbrier county, in 1868, alleging that in the year 1858 or 1859, he had sold to the appellee, John S. Gabbert, a tract of land in that county, for the sum of one thousand dollars, to be paid in annual payments of two hundred dollars each, the last becoming due on the 1st of October, 1863. That he gave his title bond to Gabbert for the conveyance of the land, and retained the title to secure the payment of the purchase money. That Gabbert neglected and refused to make payment of any of the bonds for the purchase money, as they fell due, until the year 1863, at which time he came

to the complainant's house, with Confederate treasury notes, and proposed to pay off the whole amount of the purchase money in said treasury notes; and that upon complainant's refusal to take them in discharge of such purchase money, he was threatened by Gabbert that if he persisted in refusing to take the Confederate money, he would have him arrested for disloyalty to the Confederate government, and sent to Richmond and imprisoned; and that under such threats and duress he was compelled to surrender to Gabbert his bonds for said purchase money, and to receive in payment thereof the treasury notes of the so-called Confederacy. And he avers that such Confederate notes were never used by him, nor been of any value to him whatever. And it is further alleged that Gabbert had sold the land to one Malinda Henning, who was then in possession. The legal title to said tract appears to have been in one John Stuart, at the commencement of the suit, who conveyed it to the complainant, however, in July, 1868.

Gabbert filed his answer, in which he admits the purchase of the land for the price stated in the bill; the execution of the notes and the payment of the whole of the purchase money, amounting to one thousand and thirty-seven dollars, in 1863, at the house of the complainant, in Confederate treasury notes; but he denies making any threats toward the complainant, such as are alleged in the bill, and avers that he received the treasury notes without objection, and even willingly and anxiously, as was evinced by the fact that part of the bonds for the purchase money were not due at the time of such payment; also, that he was urged by the complainant to make payment of his bonds in 1862, and was threatened by him with a suit, as late as March, 1863; and that the reason he did not pay his first two bonds as they fell due, was because he had ascertained that the title to the land was in said Stuart.

The prayer in the bill is for the sale of the land and the application of the proceeds to the payment of said purchase money.

If the charge of duress contained in the bill is sustained by the proof in the cause, then it is clear that this case is in principle like the case of *Mann* vs *Lewis and others*, 3 W. V.,

265, *Mann* vs. *McVey*, 3 W. V., 232, and must receive the same judgment.

The testimony of four witnesses is taken in the cause, who were present, at the house of the complainant, when the payment was made by the defendant. Three of them, to-wit; Margaret Rausberger, a daughter of the complainant, James C. Ludington, a son, and Francis Grant, a colored woman, testified on behalf of the complainant, and expressly proved the charge of threats and duress, on the part of the defendant made in the bill. The other, Samuel Hanna, who lived on complainant's land at the time, was introduced by the defendant and testified that he was at the house of the complainant, when the money was paid by the defendant, and heard no threats made, or any refusal to receive the Confederate treasury notes by the complainant, but stated that such threats and refusal might have taken place without his hearing them, as he was not in the house all the time defendant was there; but was passing in and out of the house during the time of such payment.

The complainant also testified in his own behalf, and sustains the charges of the bill.

The charge of duress is then established, unless this evidence is successfully rebutted and overthrown by the opposing evidence of the defendant. Looking to the whole of the testimony and weighing it with the circumstances surrounding this case, I do not think it is. The testimony of Lewis Neal, a colored witness introduced by the defendant, is entitled to no weight as he is, I think, effectually impeached.

The statements and admissions of the complainant, during the war, that he was satisfied with the currency or money he had received from the defendant; and that it was "as good as gold," &c., as proved by Mrs. Henning (the defendant's vendee of the same land), and others—being her relations, and some of them the relations of the defendants, taken as true, ought not, in my judgment to overweigh the positive evidence of duress at the time of the receipt of the treasury notes by the complainant. It is abundantly established by the testimony in the cause, (both by that of the complainants' and defendants'), that at that time there existed in that county and part of the State, a general and strong feeling of condemna-

tion against persons who refused to take Confederate money, and that threats of arrest were made against persons for refusing to take it even for their property; and that one person, Jefferson Mann had been previously arrested for his loyalty to the government of the United States, and sent to Libby Prison at Richmond, and there died.

It would therefore not seem so unreasonable, that the complainant, after he had been compelled to receive the treasury notes, and under the peculiar circumstances which then surrounded him, should have made such statements and admissions concerning them, as it might be, that he may then have supposed it was all he was likely ever to receive for his land; and knowing, as he must have known, the hazards of discrediting the Confederate currency, he may have concluded it would be the better policy thus to defend and endeavor to appreciate such currency, to the end that he might realize all he could out of what he had received from the defendant. Nor do I think the conduct of the complainant, in this respect, irreconcilable with the hypotheses that he had in fact *received* such treasury notes from the defendant, under threats and duress, as charged in the bill.

The circumstances surrounding the parties, would also seem to sustain the complainant's version of the transaction. It is shown, by the testimony, that, the complainant was anxious to receive the purchase money, as it fell due, up to the commencement of the rebellion, and about that time threatened to bring a suit for it if it was not paid. It also appears that the defendant made an ineffectual effort in April 1861 to raise the amount then due, by offering his note for two hundred dollars with the complainant and John Stuart as his securities, at the Farmer's Bank at Lewisburg, for discount, which note however was not discounted. It does not appear that the complainant afterwards made any further effort to collect any of the purchase money, or that the defendant made any to pay it, until the payment of the whole amount in 1863. It is also shown, that while the Confederate notes or currency, were nearly at par, at the beginning, and during the first year of the war, they had greatly depreciated, and become almost worthless in 1863. It does not therefore appear to me, to be probable, that the complainant, with a

knowledge of this fact, and knowing also, that his debt was well secured by a lien on the land, would willingly and without any constraint, receive such currency at par, for the full amount of his debt, *including that which was not then due, and which he was not bound to receive.* Moreover the statements of the defendant, in reference to the payment of the purchase money, seem to be inconsistent with his acts. As a reason for not paying the first two bonds when they became due, he alleges in his answer that he had ascertained that the title to the land was not in the complainant, but was in John Stuart; yet it appears that notwithstanding such knowledge, he *did* make an effort to pay them in 1861, but failed because he could not raise the money to make such payment; and afterwards, with the knowledge of the same fact, he paid the whole amount, without urging any such objection, or receiving any deed for the land. I think therefore the case comes within the principles of the cases of *Mann* vs. *Lewis and others,* and *Mann* vs. *McVey,* and must be adjudged accordingly.

Although it appears that the Confederate currency, so received by the complainant, was, at the time, greatly depreciated in value, even in that section of country, yet as it appears that he, in fact *used* the same by voluntarily vesting it in the bonds of the so-called Confederate government, I think it is but reasonable he should account to the appellee for its cash value at the time it was so invested.

In my judgment therefore the decree should be reversed with costs, and the cause remanded to the circuit court for further proceedings.

The other judges concurred.

DECREE REVERSED.